1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Ashley Pileika
New York Bar No. 974605
David Matthew Haynie
Texas Bar No. 24087692
**FORESTER HAYNIE PLLC**
400 North Saint Paul St., Suite 700
Dallas, TX 75201
P: 214-210-2100 | F: 214-346-5909
matthew@foresterhaynie.com
apileika@foresterhaynie.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GEORGE BROGDON, LAURO GARCIA, DOES 1-100,<br><br>Plaintiffs,<br><br>v.<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES a/k/a ARCHDIOCESE OF LOS ANGELES, THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF TUCSON, ST. JOHN'S SEMINARY, CARLOS COCIO, DOES 1-100, BLACK & WHITE CORPORATIONS 1-100,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT AND JURY DEMAND** |

COMES NOW George Brogdon and Lauro Garcia ("Plaintiffs"), by and through their

attorneys of record, and shows unto the Court the following:

### <u>INTRODUCTION</u>

1.  This is a racketeering or "RICO" case, pursuant to A.R.S. § 13-2314.04 and 18

    U.S.C. §§ 1961-68, against both the Archdiocese of Los Angeles and the Diocese of

-1-

COMPLAINT AND DEMAND FOR JURY TRIAL

Tucson seeking redress for the many survivors of clergy abuse, at the hands of both dioceses, in Tucson, Arizona.

2. The Arizona RICO statute, A.R.S. § 13-2314.04, authorizes a private claim for civil racketeering. Plaintiffs' complaint is grounded on multiple violations of A.R.S. § 13-2314.04(T)(3), including obstructing and hindering criminal investigations and prosecutions (A.R.S. § 13-2409) involving the sexual abuse of minors (A.R.S. § 13-2312(A)-(C)).

3. This is a federal RICO case brought pursuant to 18 U.S.C. §§ 1961-68. Plaintiffs' Complaint is grounded on multiple violations of the federal mail and wire fraud statutes embodied in the federal RICO statute prohibiting "schemes to defraud" where the fraud is "representational" or where the fraud amounts to "cheating and defrauding" without representations. This Complaint alleges violations of the federal mail fraud and wire fraud statutes in both ways.

4. To strengthen protections for victims of child sexual abuse, in May 2019, the state of Arizona also enacted H.B. 2466 which extends the amount of time victims have to pursue civil action against perpetrators.

5. H.B. 2466 allows victims who did not have the opportunity to take civil action for their abuse due to the previous two-year limit to bring a claim against their perpetrator until December 31, 2020.

6. Pursuant to H.B. 2466, Plaintiffs also bring claims for sexual assault, breach of fiduciary duty, intentional infliction of emotional distress, intentional/negligent misrepresentation, negligent supervision/retention, endangerment, and assault and battery.

---

7. Cardinal Roger M. Mahony, retired Archbishop of Los Angeles, is said to have once invited victims to meet with him one-on-one. More than 90 accepted.

8. A man who said he was molested by one of the Archdiocese's notorious sexual predators refused to shake Mahony's hand and lambasted him for more than an hour about how the priest's abuse had led to a lifetime of crime and alcoholism.

9. "How can I help you?" Mahony finally asked. "Give me my childhood back," the man replied.[1]

10. Unfortunately, this remedy is unavailable to Plaintiffs today; Plaintiffs bring this lawsuit seeking redress for themselves and those similarly situated, in the alternative.

## PATTERN OF RACKETERING BETWEEN THE ARCHDIOCESE OF LOS ANGELES AND THE DIOCESE OF TUCSON

11. St. John's Seminary in Camarillo, California is the only seminary operated by the Archdiocese of Los Angeles.[2]

12. The seminary has produced a disproportionate number of sexual predators, many of which were then sent to Tucson, a known "'dumping ground' for abusive priests.'"[3]

13. By exporting graduates of St. John's Seminary and its problematic priests to Tucson, the Archdiocese of Los Angeles knowingly exported a pervasive culture of sexual abuse and misconduct to the Diocese of Tucson's parishioners.

---

[1] Harriet Ryan, Ashley Powers & Victoria Kim, *For Roger Mahony, Clergy Abuse Cases Were a Threat to Agenda*, L.A. TIMES (Dec. 01, 2013), https://graphics.latimes.com/mahony.
[2] Paul Pringle, *Trail of Abuse Leads to Seminary*, L.A. Times (Nov. 17, 2005), https://www.latimes.com/archives/la-xpm-2005-nov-17-me-stjohns17-story.html.
[3] Stephanie Innes, *Tucson a 'Dumping Ground' for Abusive Priests*, Arizona Daily Star (Feb. 24, 2013), https://tucson.com/news/local/tucson-a-dumping-ground-for-abusive-priests/article_99076313-f4df-5602-8a11-f50efd923736.html.

COMPLAINT AND DEMAND FOR JURY TRIAL

14. By accepting, failing to report, and moving its own abusive clergy members from parish to parish, the Diocese of Tucson has likewise thwarted criminal investigations and prosecutions leading to the sexual abuse of minors.

15. Decisions to cover up rampant acts of child sex abuse, block criminal proceedings, and move predators from parish to parish evince both dioceses were willing to stop at nothing to increase their financial gains.

**St. John's Seminary Produced a Disproportionate**
**Number of Sexual Predators, Many Sent to Arizona**

16. St. John's Seminary is the alma mater of Cardinal Mahony, the former Archbishop of Los Angeles, along with many other leaders within the Roman Catholic Church.

17. Records show St John's has produced a disproportionate number of alleged sexual abusers; a *Los Angeles Times* investigation revealed about 10% of St. John's graduates reported to have been ordained in the Los Angeles Archdiocese since 1950—65 of roughly 625—have been accused of molesting minors.[4]

18. In St John's 1966 and 1972 seminary classes, a third of the graduates were later accused of molestation.[5]

19. The St. John's figures are much higher than the nationwide rate of alleged molesters in the American priesthood, as calculated by a church-commissioned survey; the John Jay College of Criminal Justice study found that 4% of priests and deacons between 1950 and 2002 were accused of abuse.[6]

---

[4] Paul Pringle, *Trail of Abuse Leads to Seminary*, L.A. TIMES (Nov. 17, 2005), https://www.latimes.com/archives/la-xpm-2005-nov-17-me-stjohns17-story.html.
[5] *Id.*
[6] *Id.*

-4-

20. Lawsuits have alleged St. John's educators and leaders were aware of the abuse but turned a blind eye.

21. One former St. John's student, Richard Nason, filed an affidavit in an Orange County Superior Court case, in which he contended a former St. John's instructor sexually assaulted at least two of his classmates and made unwelcome sexual advances toward him.[7]

22. Nason went to the dean of students at St. John's to tell him about the priest's misconduct but was informed by the dean it was "impossible" the priest was acting in this manner and no action could be taken unless Nason himself was involved – which Nason understood to mean *he* would have to submit to sexual advances by the priest in order to have any grounds to make a complaint.[8]

23. A plaintiff in another lawsuit alleged she was molested by a St. John's deacon seminarian assigned to her parish when she was 16 years-old; when a St. John's rector saw the deacon seminarian embracing the 16-year-old girl in his dorm room, he just closed the door and did not inquire why she was there.[9]

24. During the 1970s and 1980s, a Tucson priest, Robert Trupia, was renowned for his "Come and See" weekends, in which he sponsored young prospective seminarians from Tucson for visits to St. John's.[10]

---

[7] Ron Russell, *Mahony's Cronies*, https://www.ronrussell.org/mahonys-cronies (June 13, 2002).
[8] *Id.*
[9] *Id.*
[10] William Lobdell, *Catholic Church to Pay Settlement to Close Abuse Case*, L.A. TIMES (Jan. 30, 2002) https://www.latimes.com/archives/la-xpm-2002-jan-30-me-molest30-story.html.

COMPLAINT AND DEMAND FOR JURY TRIAL

25. Although a housekeeper reportedly caught Trupia in bed with a minor in 1982 and alerted St. John's leadership, the Archdiocese of Los Angeles continued to allow Trupia, to bring prospective seminarians to St. John's for another six years, until he was caught once again having sex with a minor on St. John's campus.[11]

26. In the late 1980's, the Rev. George Niederauer, now the bishop of Salt Lake City and a former spiritual director of St. John's, asked for leniency from a judge for the Rev. Andrew Christian Andersen, an Orange County priest who had been convicted of 26 counts of child abuse. Bishop Niederauer wrote in a letter that the boys might have interpreted "horse play" as molesting.[12]

27. On its website, the Diocese of Tucson continues to list St. John's as the seminary that provides graduate level theological education in preparation for ministry to its ordination candidates.[13]

**Leaders Within the Archdiocese of Los Angeles Purposefully
Sent Predators to Arizona to Evade Criminal and Civil Liability**

28. Retired Archbishop of Los Angeles, Cardinal Roger M. Mahony, and other high-ranking clergymen in the archdiocese have worked to quietly keep evidence of child molesting away from law enforcement officials and shield abusive priests from criminal prosecution.

29. Rather than defrocking priests and contacting the police, the Archdiocese sent priests who had molested children to out-of-state treatment facilities, in large part because

---

[11] Russell, *supra* note 7.
[12] Nick Madigan, *California Diocese's Documents Show Abuse Cover-Up*, N.Y. TIMES (May 19, 2005), https://www.nytimes.com/2005/05/19/us/california-dioceses-documents-show-abuse-coverup.html.
[13] *Meet our Seminaries*, DIOCESE OF TUCSON, https://diocesetucson.org/meet-our-seminarians (last visited Dec. 29, 2020).

COMPLAINT AND DEMAND FOR JURY TRIAL

therapists in California were legally obligated to report any evidence of child abuse to the police.

30. In 1986, Cardinal Mahony wrote to a New Mexico treatment center where one abusive priest, Monsignor Peter Garcia, had been sent.

31. "I believe that if Monsignor Garcia were to reappear here within the archdiocese we might very well have some type of legal action filed in both the criminal and civil sectors," Cardinal Mahony wrote.[14]

32. Monsignor Garcia admitted to abusing more than a dozen young boys, most of them from families of illegal immigrants, since he was ordained in 1966, and in at least one case he threatened to have a boy he had molested deported if he talked about it, according to documents filed in court.[15]

33. Thomas Curry, then the archdiocese's chief advisor on sex abuse cases, wrote in a letter to Mahony he was worried about bringing Garcia back to work in Los Angeles because victims in the area might see the priest and call the police.[16]

34. "[T]here are numerous — maybe twenty — adolescents or young adults that Peter [Garcia] was involved with in a first degree felony manner. The possibility of one of these seeing him is simply too great," Curry wrote in May 1987.[17]

---

[14] Ian Lovett, *Los Angeles Cardinal Hid Abuse, Files Show*, N.Y. TIMES (Jan. 21, 2013), https://www.nytimes.com/2013/01/22/us/files-show-cardinal-roger-mahony-covered-up-sex-abuse.html.
[15] Victoria Kim, Ashley Powers & Harriet Ryan, *L.A. Church Leaders Sought to Hide Sex Abuse Cases from Authorities*, L.A. Times (Jan. 21, 2013), https://www.latimes.com/local/la-me-church-files-20130122-story.html .
[16] *Id.*
[17] *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

35. Two more documented examples of predatory priests sent to Arizona by Cardinal Mahony, to avoid criminal and civil liability for the Los Angeles Archdiocese, follow.

### Father Michael Baker

36. Father Michael Baker attended St. John's Seminary in Camarillo, California. Ordained in 1974, he initially served as an associate pastor at St. Joan of Arc parish in West Los Angeles for two years before transferring to St. Paul of the Cross in La Mirada.

37. During a spiritual retreat in December 1986, Father Michael Baker informed Mahony, then Archbishop of Los Angeles, that he had molested two young boys from 1978-85.[18]

38. Instead of inquiring about the victims' identities or notifying police, Mahony sent Baker to a treatment in New Mexico.

39. "We are dealing with an extremely serious and grave situation," Mahony wrote in a Dec. 24, 1986, memo to Baker, ordering him to undergo therapy at Foundation House, a now-defunct treatment center for pedophile clergy in New Mexico.[19]

40. While in New Mexico, Baker wrote to Mahony and to Curry, then the vicar of clergy, updating them on his progress in therapy and his hopes, and concerns, for his future.

41. In one undated letter, Baker suggested he be assigned to serve at a mission in Mexico to evade the threat of criminal or civil action and stay out of the Archdiocese for at least five years: "The criminal statute of limitations — is that 5 years? Are there any

---

[18] Barbara Jones, *Father Michael Baker was Accused of Molesting 23 Youngsters*, SAN GABRIEL VALLEY TRIB. (Jan. 26, 2013), https://www.sgvtribune.com/2013/01/26/father-michael-baker-was-accused-of-molesting-23-youngsters.
[19] *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

statute of limitations civilly? I am very much aware that I am a jeopardy for the Archdiocese."[20]

42. Baker also expressed appreciation for receiving a recent check and wrote he was "grateful to be on the Archd. payroll. Blessings on your thoughtfulness."[21]

43. After Baker's short stint in therapy, he was allowed back into ministry.

44. In 2000, two brothers living in Arizona, stepped forward prepared to sue the Archdiocese of Los Angeles, accusing Baker of molesting them from 1984 to 1999 in Arizona and California. In response, Mahony signed off on a secret $1.3 million settlement.[22]

45. The archdiocese's attorney, John McNicholas, told the cardinal that "for the safety of the community, the faithful must be alerted."[23]

46. Vaguely worded parish announcements about Baker's "past inappropriate behavior with minors" in another state were proposed by the archdiocese's attorney, but even that was too much for Mahony.[24]

47. "There is no alternative to public announcements at all the Masses in 15 parishes???" Mahony emailed his top aide, Msgr. Richard Loomis. "Wow — that really scares the daylights out of me!!"[25]

---

[20] *Id.*
[21] *Id.*
[22] *Ex-Priest Arrested on Abuse Charges*, https://www.washingtonpost.com/archive/politics/2002/09/26/ex-priest-arrested-on-abuse-charges/84f497e4-4721-4f4d-ac84-4fa9212add53/ (last visited Dec. 29, 2020).
[23] Kim, Powers & Ryan, *supra* note 1.
[24] *Id.*
[25] *Id.*

48. "We could open up yet another fire storm — and it takes us years to recover from those," Cardinal Mahony wrote. No announcement was made.[26]

49. Msgr. Loomis told a colleague that how Mahony had handled Baker was "immoral and unethical" — and shortsighted.[27]

50. "Someone else will end up owning the Archdiocese of Los Angeles," Msgr. Loomis wrote in a memo. "We've stepped back 20 years and are being driven by the need to cover-up and to keep the presbyterate [priests] & public happily ignorant rather than the need to protect children."[28]

51. According to a 2004 archdiocese report, Baker was accused of molesting 23 minors.[29]

### *Rev. Kevin Barmasse*

52. Rev. Kevin Barmasse was ordained a priest for the Los Angeles Archdiocese in 1982 after graduating from St. John's Seminary.

53. After Barmasse was accused of molesting a young boy in Los Angeles in 1983, he was sent to the Diocese of Tucson.

54. Barmasse did not remain in Arizona by chance; the longer Barmasse stayed in Arizona, the less likely it became a civil or criminal lawsuit could be filed against the Archdiocese of Los Angeles.

55. Church documents have shown the Los Angeles Diocese knew Barmasse was a sexual predator and would not allow him to return and minister there; yet they did not stop him from leading parish youth groups in the Diocese of Tucson.

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Jones, *supra* note 18.

COMPLAINT AND DEMAND FOR JURY TRIAL

56. Letters that are part of Barmasse's 363-page file show that Los Angeles church officials, including Mahony himself, more than once denied Barmasse's request to return to Los Angeles.[30]

57. "Given the history of your particular case, I would strongly recommend that you not return to Southern California for any type of priestly ministry." Mahony wrote to Barmasse on Dec. 1, 1987. "You might be better advised to continue on there in Arizona where you have found a home and new friends in your pastoral work. I would not recommend that you begin looking for another diocese unless your situation should change dramatically, thus requiring such a special step."[31]

58. Barmasse remained in Tucson for eight years, from 1983 to 1991, where he was moved to three different dioceses, where he led youth groups and had the opportunity to befriend vulnerable youth.[32]

59. By the early 1990s, complaints from youth group members and their parents in the Diocese of Tucson had begun to surface. Among the accusations was that Barmasse tried to get a 15-year-old boy to perform oral sex on him and that he provided the boy and others with beer and pornographic movies. One boy said he'd been fondled on at least seven occasions between 1986 and 1987.[33]

60. In 2003 when lawsuits were filed by men who said they had repressed memories of the abuse, one said he had had both oral and anal sex with Barmasse when he was 16.

---

[30] Innes, *supra* note 3.
[31] *Id.*
[32] Barmasse's assignments in the Diocese of Tucson were at St. Andrew the Apostle in Sierra Vista from 1983 to 1986, at St. Elizabeth Ann Seton on Tucson's Northwest Side between 1986 and 1988, and at Blessed Sacrament in Mammoth from 1988 to 1991.
[33] Innes, *supra* note 3.

COMPLAINT AND DEMAND FOR JURY TRIAL

61. In 1991, the Los Angeles Archdiocese arranged for Barmasse to begin residential treatment at a facility in Maryland.[34]

62. After he was discharged, Mahony decided Barmasse was not fit for ministry; the Los Angeles Archdiocese paid for his ongoing therapy.

63. Barmasse asked the Archdiocese of Los Angeles for $50,000 after he became an inactive priest; the Archdiocese offered him $10,000.[35]

64. Barmasse was defrocked in 2006, 23 years after his first reported sexual abuse of a 12-year-old Los Angeles boy, more than 15 years after the alleged abuse of the five Tucson youths and 14 years after Los Angeles church officials suspended him from ministry.

65. Diocese of Tucson Bishop Gerald F. Kicanas has said Barmasse should not have been allowed to minister in Tucson or anywhere else, and that such an arrangement would not be allowed today by the diocese's own policies nor the policies the bishops of the United States have put into place.[36]

**The Diocese of Tucson Failed to Report Predators in Its Parishes,
<u>Leading to a Large Number of Victims in the Tucson Area</u>**

66. At least 28 clergy members within the Diocese of Tucson have been credibly accused of sexually abusing over 100 minors, many of which are now adults and reside in the greater Tucson area.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

67. The Diocese of Tucson has publicly stated its procedures for preventing the sexual abuse of minors, which includes alerting law enforcement when accusations are made.

68. In July 2020, Plaintiff Lauro Garcia's counsel sent a letter to the Diocese of Tucson's "Office of Child, Adolescent, and Adult Protection."

69. Garcia informed Richard Serrano, the Diocese's Interim Director of the Office of Child, Adolescent, and Adult Protection that he had been sexually abused as a minor by Carlos Cocio, a known sexual offender.

70. In response, Serrano informed Garcia that "Carlos Cocio left the priesthood in 2012." Nowhere in his response did Serrano indicate the Diocese planned to properly examine and address Plaintiff's complaint, thereby disregarding its legal duty as a mandatory reporter to relay allegations of child sex abuse to law enforcement.

71. The Diocese of Tucson has also violated canon law.

72. Both the Archdiocese of Los Angeles and the Diocese of Tucson have publicly stated their commitment to help anyone who may be a victim and cooperate with law enforcement authorities as required by the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons* (Norm 11) and the *Charter for the Protection of Children and Young People* adopted by the United States Conference of Catholic Bishops (USCCB) in 2002.[37]

---

[37] *9.8.1 – Reporting Allegations of Sexual Abuse of Minors to Public Authorities*, ARCHDIOCESE OF L.A., https://handbook.la-archdiocese.org/chapter-9/section-9-8/topic-9-8-1 (last visited Dec. 29, 2020).

73. The USCCB adopted a multi-layered approach to reviewing, evaluating, and investigating allegations of sexual abuse of minors by clergy in 2002.[38]

74. Specifically, the Diocese of Tucson's July 2020 letter to Plaintiff's counsel evidences its failure to:

- investigate or conduct timely, independent, sufficient, or reasonable internal investigations into Plaintiff's allegations of the sexual abuse of a minor;

- seek or reasonably document the assessments of allegations by an advisory board established to assist the bishop's evaluation of sexual abuse claims;

- refer or timely refer unassignable priests to the Vatican authority with oversight of the adjudication of claims of clergy sexual abuse of minors;

- inquire into violations of the *Charter* and the Essential Norms;

- and prepare accurate business records regarding accused priests.

75. Upon information and belief, Carlos Cocio, a 65-year-old male, is alive and currently resides in Tucson, Arizona; despite many credible allegations made against Cocio, no criminal charges have ever been filed against him, and Cocio is not listed on any sex offender registry.

76. The Diocese of Tucson, which declared bankruptcy in 2004, further claimed in its July 2020 letter to Plaintiff's counsel, "[n]o claims that were or could have been asserted against the Settlement Trust (the Reserve) may be asserted against the Diocese. The Diocese shall have not liability arising from the Settlement Trust or its

---

[38] *See Charter for the Protection of Children and Young People*, UNITED STATES CONFERENCE OF BISHOPS, https://www.usccb.org/offices/child-and-youth-protection/charter-protection-children-and-young-people (last visited December 29, 2020).

COMPLAINT AND DEMAND FOR JURY TRIAL

termination. The Court's documents have made clear that any tort claims arising out of actions that occurred prior to the date the Diocese filed bankruptcy have been discharged."

## JURISDICTION

77. This Court has subject matter jurisdiction over Plaintiffs' claims under 18 U.S.C. § 1961, et seq., under 18 U.S.C. § 1964(a); (c) ("Federal RICO").

78. Plaintiffs George Brogdon and Lauro Garcia are residents of Tucson, Arizona.

79. The acts, events, omissions, and Plaintiffs' injuries alleged herein occurred in Tucson, Arizona.

80. Defendant Carlos Cocio is an adult man who resides in Tucson, Arizona.

81. Defendant Diocese of Tucson is a non-profit religious organization with its principal place of business in Tucson, Arizona.

82. Defendant Archdiocese of Los Angeles, a corporation sole, is a non-profit religious organization with its principal place of business in Los Angeles, California.

83. Defendant St. John's Seminary is a non-profit religious organization, under the Archdiocese of Los Angeles, with its principal place of business in Camarillo, California.

### George Brogdon

84. George Brogdon and his family were parishioners of St. Andrews Catholic Church in Sierra Vista, Arizona in the late 1970s.

85. George served at St. Andrews as an altar boy.

86. Father Bob Gluch was an associate pastor and ran the youth group at St. Andrews Catholic Church from 1976-1981.

-15-

COMPLAINT AND DEMAND FOR JURY TRIAL

87. Beginning in 1978, after mass, Father Bob Gluch would routinely pull George into a back room of the church.

88. Once Father Gluch had secluded George in the room, he would disrobe and expose himself. He would then force George to disrobe and begin to grope and fondle him.

89. When George's mother discovered Father Gluch was sexually assaulting her son, she and George confronted Father Gluch; during this confrontation, Father Gluch physically assaulted George, slapping him in the face in front of George's mother.

90. After Father Gluch physically assaulted George, George and his mother drove to Tucson to report the sexual and physical assault to Bishop Francis Joseph Green.

91. Bishop Green assured George's mother that Father Gluch would be removed from ministry; because of Bishop Green's assurance, George's mother did not report Father Gluch to law enforcement.

92. Within a week of George's visit to Bishop Green, Father Gluch was removed from St. Andrews Catholic Church.

93. Father Gluch was replaced at St. Andrews Catholic Church by Father Kevin Barmasse, who the Archdiocese of Los Angeles knowingly and purposefully transferred to the Tucson Diocese after Barmasse was accused of molestation in Los Angeles.

94. George later discovered Father Gluch had been relocated to St Patrick Catholic Church in Bisbee, AZ, where he served from 1981-1983.

95. At least eight other victims have filed lawsuits in Arizona and California for sexual abuse Father Gluch subjected them to in both states when they were minors.

**Lauro Garcia**

-16-

COMPLAINT AND DEMAND FOR JURY TRIAL

96. Lauro Garcia and his family were members of Sacred Heart Parish in Nogales, AZ.

97. In June 1980, Lauro traveled to the Cathedral of Saint Augustine in Tucson, AZ with Sacred Heart Parish's choir to celebrate the ordainment of Joseph Octavio Tye.

98. After the ordainment, Lauro attended a reception for Father Tye at the Cathedral of Saint Augustine, where he met Father Carlos Cocio.

99. At the time, Father Cocio was a seminary student at St. John's in Camarillo, California.

100.    Lauro came from a single-parent home, his father left the family when Lauro was young.

101.    Father Cocio took an immediate interest in Lauro.

102.    Lauro told Father Cocio he was interested in becoming a priest himself one day.

103.    Father Cocio encouraged Lauro to return to Tucson to discuss joining the Church with him.

104.    Lauro trusted Father Cocio, so he returned to Tucson by bus to discuss joining the seminary with Father Cocio.

105.    Father Cocio picked Lauro up from the bus station in Tucson in a blue Chevrolet Nova Father Cocio said he borrowed from his sister; Father Cocio promised to drive Lauro back to Nogales later the same day.

106.    Once Lauro and Father Cocio were behind closed doors in Tucson, however, the conversation quickly came to a halt.

107.    Against Lauro's pleas, Father Cocio began making aggressive sexual advances towards Lauro; Father Cocio then repeatedly sodomized Lauro.

-17-

COMPLAINT AND DEMAND FOR JURY TRIAL

108.   Father Cocio sodomized and sexually assaulted Lauro repeatedly over the course of the next two days.

109.   Father Cocio then dropped Lauro off at a bus station.

110.   To this day, Lauro remembers the bus ride from Tucson to Nogales as one of the most painful experiences of his life.

111.   When Lauro returned to Sacred Heart Parish in Nogales, Arizona, he told several clergy members, including Monsignor Walter Rosensweig that he had been raped by Father Cocio; Lauro recalls Monsignor Rosensweig laughed when Lauro told him this and said no one would believe Lauro was raped by a priest.

112.   Lauro was subsequently sexually assaulted by Monsignor Rosensweig while working alone as an evening receptionist at Sacred Heart Parish in Nogales, Arizona.

113.   Lauro specifically remembers running out of the church's office on numerous occasions to avoid Monsignor Rosensweig.

**COUNT I**
**Violation of A.R.S. § 13-2314 ("Arizona RICO")**
**(All Defendants)**

114.   Pursuant to A.R.S. § 13-2314.04 ("Arizona RICO"), a person who sustains reasonably foreseeable injury to his person, business or property by a pattern of racketeering activity, or by a violation of § 13-2312 involving a pattern of racketeering activity, may file an action in superior court for the recovery of treble damages and the costs of the suit, including reasonable attorney fees for trial and appellate representation.

115.   Among others, a single act of obstructing or hindering criminal investigations or prosecutions committed for financial gain constitutes a pattern of racketeering activity

COMPLAINT AND DEMAND FOR JURY TRIAL

under A.R.S. § 13-2301 (D)(4)(b) – the stakes are raised when minors are the victims of such racketeering (A.R.S. § 13-2312(A)-(C)).

116.    Plaintiffs incorporate all other paragraphs to evidence. Defendants have demonstrated a clear pattern of the aforementioned racketeering activity, in furtherance of both dioceses' financial gain.

117.    The Archdiocese of Los Angeles funneled predatory priests to Arizona, where they were accepted into ministry by the Diocese of Tucson. The pattern of racketeering between these two dioceses created a pervasive culture where the sexual abuse of minors was not only accepted but embraced by many active clergy in Tucson.

118.    Instead of removing abusive priests from ministry and reporting them to law enforcement, leaders within the Archdiocese of Los Angeles and the Diocese of Tucson have routinely shielded predatory priests from criminal investigations and prosecutions, discouraging victims and their families from alerting authorities – and going so far as compensating abusive clergy to travel and reside outside of a state where civil and criminal prosecutions could be pursued.

119.    The Archdiocese of Los Angeles and the Diocese of Tucson have both financially benefited from, and continue to benefit from, the enterprise they have created which prioritizes funds to both dioceses and obstructs civil and criminal prosecutions and the associated costs.

120.    By declaring bankruptcy in 2004, the Diocese of Tucson has taken further steps to protect its financial interests and renounced "any tort claims arising out of actions that occurred prior to the date the Diocese filed bankruptcy have been discharged."

121.   The Diocese of Tucson's 2004 bankruptcy, however, does not absolve it from tort claims that were ongoing at the time it filed for bankruptcy – or any that have accrued thereafter.

122.   In recent years, the Archdiocese of Los Angeles and the Diocese of Tucson have publicly assured their communities and law enforcement that abusive clergy will be removed from ministry and reported to the authorities.

123.   In 2003, a spokesman for the Diocese of Tucson, issued a statement "urg[ing] anyone who has experienced abuse by anyone working for the church to come forward at this time so that a report can be made immediately to law enforcement."[39]

124.   In July 2020, Plaintiffs' counsel discovered the Diocese of Tucson does not immediately report allegations of child sexual abuse to law enforcement – even when claims are made against a living priest in the Tucson area, who has been credibly accused of sexual misconduct with minors in the past.

125.   The Diocese of Tucson continues to receive priests from St. John's Seminary, operated by the Archdiocese of Los Angeles.

126.   Thus, the continued threat of racketeering acts pervades because the Diocese of Tucson continues to send its seminarians to St. John's Seminary, which is operated by the Archdiocese of Los Angeles and is notorious for producing predatory priests, and recent communications with the Diocese of Tucson's Office of Child, Adolescent, and Adult Protection indicates the Diocese of Tucson does not immediately report incidents of child sex abuse to law enforcement.

---

[39] Eric Sagara, *4 New Sex-Abuse Lawsuits Filed in Calif. Against Tucson Diocese*, http://www.bishop-accountability.org/news3/2003_10_06_Sagara_4New_Robert_Gluch_7.htm (Oct. 6, 2003).

COMPLAINT AND DEMAND FOR JURY TRIAL

**COUNT II**
**DEFENDANTS' PATTERN OF UNLAWFUL ACTIVITY UNDER**
**18 U.S.C. § 1961: INTERSTATE AND INTERNATIONAL MAIL AND WIRE FRAUD**
**(All Defendants)**

127.    As the spiritual leaders of Plaintiffs in positions of authority and power,

Defendants knew that Plaintiffs put their faith, trust, and confidence in them (and the

clergy of the Archdiocese of Los Angeles and Diocese of Tucson generally).

128.    Nevertheless, Defendants intentionally devised, engaged in, condoned and/or

ratified the above-referenced open-ended and unlawful schemes to defraud and cheat

Plaintiffs.

129.    Defendants have utilized the enterprise forged by the Archdiocese of Los Angeles

and the Diocese of Tucson to engage in unlawful and intentional schemes to (i)

defraud Plaintiffs via misrepresentations and omissions (on which Plaintiffs

Defendants, clergy members, and/or other third parties justifiably relied), and (ii)

defraud Plaintiffs by cheating them via means of false or fraudulent pretenses—first

subjecting Plaintiffs to sexual abuse, then covering up and concealing the sexual

abuse so as to maintain Defendants' reputations and maintain and expand their

commercial operations whereby Defendants and the enterprise obtained (and continue

to obtain) money, funds, credits, assets, and/or other property, and, in the process,

cheating and defrauding Plaintiffs out of their childhood, youth, innocence, virginity,

families, jobs, finances, assets—in short, their lives.

130.    Defendants carried out these schemes to defraud through their forged enterprise

using the United States and international mail in violation of 18 U.S.C. § 1341.

Defendants also carried out these schemes to defraud using interstate and

-21-

COMPLAINT AND DEMAND FOR JURY TRIAL

international telephone calls and electronic communications in violation of 18 U.S.C. § 1343.

131.    Defendants' schemes to defraud involved (and continue to involve) means of false or fraudulent pretenses and/or fraudulent and intentionally misleading representations and omissions.

132.    Defendants' above-described multiple, repeated, and continuous acts of interstate

133.    and international mail and wire fraud constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5).

134.    Nothing in Defendants' actions demonstrates that their open-ended, unlawful, and intentional schemes to defraud and cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of will ever terminate but for this Court's intervention.

135.    Moreover, and independent of the duration of the schemes, Defendants' above-described unlawful and intentional schemes, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were (and continue to be) a consistent, regular and dominant part of the manner in which they participate in, and conduct their day-to-day dealings with, Plaintiffs, third parties, and clergy operating within the enterprise they have forged to shelter from any legal or financial repercussions.

**COUNT III**
**SEXUAL ASSAULT/SEXUAL ABUSE/MOLESTATION**
**(Defendant Carlos Cocio)**

1.    Plaintiffs incorporate all other paragraphs.

-22-

2.  Defendant Carlos Cocio intentionally, knowingly, recklessly, or negligently engaged in sexual contact with Plaintiff Lauro Garcia.

3.  Defendant Cocio intentionally, knowingly, recklessly, or negligently engaged in sexual contact, without Plaintiff Lauro Garcia's consent and when he was a minor incapable of consenting to such sexual contact.

4.  As a direct and proximate cause of Defendant's wrongful acts Plaintiff Lauro Garcia suffered and will continue to suffer in the future physical and emotional injury including, but not limited to, great pain of mind and body, shock, mental anguish, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling, and past and future loss of earnings.

5.  The allegations set forth in this Count constitute traditional negligence and negligence per se for laws enacted for the protection of a specific class of persons of which Plaintiff Garcia is a member.

## COUNT IV
## **BREACH OF FIDUCIARY DUTY**
### (All Defendants)

6.  Plaintiffs incorporate all other paragraphs

7.  Defendants' clergy were spiritual guides, counselors, and shepherds to Plaintiffs. Given these relationships, and as fiduciaries to Plaintiffs, Defendants owed a duty to investigate, obtain, and disclose misconduct, sexual assault, sexual abuse, molestation, sexual propensities, and other inappropriate acts of its priests, including

-23-

Father Gluch and Father Cocio. As fiduciaries, counselors and spiritual guides, Defendants owed Plaintiffs a duty to work solely for their benefit.

8. Defendants breached their fiduciary duties owed to Plaintiffs.

9. As a direct and proximate cause of Defendants' breach, Plaintiffs suffered and will continue to suffer in the future great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affections, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

10. Plaintiffs incorporate all other paragraphs.

11. Defendants' wrongful conduct, including sexual abuse, conspiracy to conceal sexual abuse, failure to report the sexual abuse of children by known sexual predators in their dioceses, affirmance, and ratification of clergy's sexual abuse exceeded the bounds of decency and were extreme and outrageous causing Plaintiffs to suffer severe emotional and psychological distress.

12. As a direct and proximate cause of Defendants' wrongful conduct Plaintiffs suffered and will continue to suffer the future physical and emotional injury including, but not limited to, great pain of mind and body, shock, mental anguish, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual

-24-

dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling, and past and future loss of earnings.

## COUNT VI
## INTENTIONAL/NEGLIGENT MISREPRESENTATION
### (All Defendants)

13. Plaintiffs incorporate all other paragraphs.

14. Defendants have a duty to provide true, accurate, and complete information to prevent a substantial and foreseeable risk of injury to young Catholic parishioners and students.

15. Instead of reporting and disclosing incidents of sexual abuse, predatory priests' history of sexual abuse and propensity to sexually abuse young boys, Defendants breached their duties to Plaintiffs by providing vague, incomplete, and inconsistent information regarding their ability to serve as Roman Catholic priests.

16. As a direct and proximate cause of Defendants' breach, Plaintiff suffered and will continue to suffer in the future great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling.

## COUNT VII
## NEGLIGENT SUPERVISION/RETENTION
### (All Defendants)

17. Plaintiffs incorporate all other paragraphs.

-25-

18. Defendants had a duty to hire, fire, train, retain, supervise, and counsel employees or priests who had the knowledge, education, training, physical, psychological, and spiritual ability to serve as Roman Catholic priests.

19. The Dioceses of Los Angeles and Tucson knew or should have known that priests with histories of sexual abuse were likely to victimize more children, if adequate measures were not taken.

20. Defendants, individually and in concert with the others, breached their duties to Plaintiffs.

21. As a direct and proximate cause of Defendants' breach, Plaintiffs suffered and will continue to suffer in the future enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling.

**COUNT VIII**
**ENDANGERMENT**
**(All Defendants)**

22. Plaintiffs incorporate all other paragraphs.

23. Defendants have a duty to protect children from foreseeable and unjustifiable risks of harm.

24. Defendants knew or should have known Father Gluch and Father Cocio sexually abused Catholic children.

25. Defendants, individually and or in agreement with each other, emboldened Father Gluch and Father Cocio to travel freely between parishes in the Los Angeles and Tucson Dioceses, having unrestricted access to minors, despite indications of their propensity to prey on young boys.

-26-

COMPLAINT AND DEMAND FOR JURY TRIAL

26. Father Gluch and Father Cocio posed a substantial risk of significant physical and psychological injury to Catholic children, including Plaintiffs.

27. Defendants, individually and in concert with each other, recklessly endangered the health and well-being of Catholic children, including Plaintiffs, by exposing them to abusive clergy members, who remained active members of the dioceses' ministry.

28.  Defendants, individually and in concert with each other, recklessly endangered the health and well-being of Catholic children, including Plaintiffs by exposing them to abusive clergy members. Defendants caused, established, and/or allowed patterns, practices, customs, and traditions that places Plaintiffs in situations where their person, physical health, and mental/emotional wellbeing was endangered.

29. Defendants intentionally, recklessly, and/or negligently endangered and sexually abused Plaintiffs.

30. As a direct and proximate cause of Defendants' sexual abuse of Plaintiffs, Plaintiffs suffered and will continue to suffer in the future great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling.

**COUNT IX**
**ASSAULT AND BATTERY**
**(All Defendants)**

31. Plaintiffs incorporate all other paragraphs.

32. At all times relevant to this complaint, Father Gluch and Father Cocio were over the age of 18, and Plaintiffs were under the age of 18.

-27-

33. Father Gluch and Father Cocio intentionally, knowingly, and/or recklessly caused serious physical and mental/emotional injuries to Plaintiffs.

34. Father Gluch and Father Cocio intentionally, knowingly, recklessly, and/or negligently placed Plaintiffs in reasonable apprehension of imminent physical injury.

35. Father Gluch and Father Cocio intentionally, knowingly, recklessly, and/or negligently touched Plaintiffs with the intent to injure, insult, or provoke.

36. The allegations set forth in this Count constitute negligence and negligence per se enacted for the protection of a specific class of persons of which Plaintiffs are members.

37. As a direct and proximate cause of Defendants' abuse of Plaintiffs, Plaintiffs suffered and will continue to suffer in the future great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling.

## **JURY TRIAL DEMAND**

38. Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## **PRAYER FOR RELIEF**

39. WHEREFORE, Plaintiff prays for the following relief against Defendants:

   a) For Plaintiff's general and special damages in an amount to be proven at trial by jury.

   b) For Plaintiffs' treble damages, as prescribed by A.R.S. § 13-2314 and 18 U.S.C. § 1961-68.

-28-

COMPLAINT AND DEMAND FOR JURY TRIAL

c)  For Plaintiffs' incurred costs together with interest at the highest lawful rate on the total amount of all sums awarded from the date of judgment until paid.

d)  For the fair and reasonable monetary value of Plaintiff's past, present, and future pain and suffering in an amount to be proven at trial by jury.

e)  For the medical expenses incurred up to the date of trial and any additional expenses necessary for future medical care and treatment.

f)  Economic damages in the form of out-of-pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action.

g)  For punitive damages or exemplary damages to be set by a jury in an amount sufficient to punish Defendants for their outrageous conduct and to discourage others from engaging in similar conduct in the future.

h)  Costs including reasonable attorneys' fees and costs, court costs, and other litigation expenses; and

i)  For such other and further relief as this Court may deem just and proper.

Dated this 31st day of December, 2020.   Respectfully Submitted,

/s/ Ashley Pileika
**Ashley M. Pileika**

/s/ David Matthew Haynie
**David Matthew Haynie**

*Attorneys for Plaintiffs*

-29-

COMPLAINT AND DEMAND FOR JURY TRIAL