**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| George Brogdon, et al., | No. CV-20-00566-TUC-JAS (MSA) |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| v. | |
| Roman Catholic Archbishop of Los Angeles, et al., | |
| Defendants. | |

Pending before the Court are The Roman Catholic Church of the Diocese of Tucson's (Diocese), The Roman Catholic Archbishop of Los Angeles's (Archbishop), and St. John's Seminary's (Seminary) motions to dismiss. (Docs. 45, 46, 47.) The motions have been fully briefed, and oral argument was heard on October 29, 2021. (Docs. 51, 52, 55, 56, 62, 65.) For the following reasons, the Court will recommend that the motions be granted in part and that this case be dismissed.

## Factual Background

The second amended complaint contains the following allegations: The Seminary is operated by the Archbishop in California and has a longstanding relationship with the Diocese in Arizona. (Doc. 44, ¶¶ 9, 12, 28.) The Seminary has produced a disproportionate number of sexually abusive priests. (*Id.* ¶¶ 11, 17–20.) Instead of defrocking and reporting these priests, the Archbishop sends them to out-of-state treatment facilities to shield them from criminal prosecution in California. (*Id.* ¶ 30.) The Archbishop also sends abusive priests to the Diocese in Arizona. (*Id.* ¶¶ 11, 13.) When members of the clergy are accused

of sexual abuse in Arizona, the Diocese shields them from criminal prosecution by transferring them from parish to parish. (*Id.* ¶ 14.) In facilitating and covering up sexual abuse committed by members of the clergy, the Diocese, the Archbishop, and the Seminary engage in wire fraud, mail fraud, and obstruction of justice. (*Id.* ¶¶ 3, 75.)

Plaintiffs are five individuals who were sexually abused during their childhoods by members of the Roman Catholic clergy. Plaintiffs James Stein and George Brogdon were abused by Father Robert Gluch. (*Id.* ¶¶ 95, 103.) Stein's abuse occurred in 1967, when Father Gluch was a minister at St. Gregory's Church in Phoenix, Arizona. (*Id.* ¶¶ 89, 94–95.) Brogdon's abuse occurred in 1978, when Father Gluch was a minister at St. Andrew's Church in Sierra Vista, Arizona. (*Id.* ¶¶ 98, 101–03.) In 1980, Plaintiff Lauro Garcia was abused by Father Carlos Cocio, who was then a student at the Seminary and on a visit to southern Arizona. (*Id.* ¶¶ 112–14, 121–23.) Garcia was also abused by Monsignor Walter Rosensweig at the Sacred Heart Parish in Nogales, Arizona. (*Id.* ¶ 127.) During the 1970s, Plaintiffs Diana Almader-Douglas (Almader) and Jane Doe were abused by Father Charles Knapp, who was then a minister at St. Bernard's Parish in Pirtleville, Arizona. (*Id.* ¶¶ 133, 136–37, 162, 166–67; Doc. 44-1 at 3.)

Plaintiffs allege a claim for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO). This claim serves as the basis for the Court's subject-matter jurisdiction. 28 U.S.C. § 1331. Plaintiffs also invoke the Court's supplemental jurisdiction to bring various claims under Arizona state law. *Id.* § 1367(a).

**Personal Jurisdiction**

The Archbishop and the Seminary contend that they must be dismissed for lack of personal jurisdiction. The Court agrees.

## I. Legal Standard

"The plaintiff bears the burden of demonstrating that personal jurisdiction is proper." *Glob. Commodities Trading Grp. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). To meet this burden, the plaintiff must "demonstrat[e] that its

allegations establish a prima facie showing of personal jurisdiction." *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018) (citing *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008)). Uncontroverted allegations in the complaint must be taken as true, and genuine factual disputes must be resolved in the plaintiff's favor. *Glob. Commodities*, 972 F.3d at 1106.[1]

## II.    Personal Jurisdiction Under the Constitution

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "Arizona law permits the exercise of personal jurisdiction to the extent permitted under the United States Constitution." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017). The Constitution, in turn, authorizes the exercise of personal jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Depending on the nature of the defendant's contacts with the forum state, a court can have general jurisdiction, specific jurisdiction, or both. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1779–80 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

### A.    General Jurisdiction

A court has general jurisdiction when the "defendant is 'essentially at home' in the State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear*, 564 U.S. at 919). For a corporation, the "paradigm" forums for the exercise of general jurisdiction are "its place of incorporation and principal place of

---

[1]    The Archbishop and the Seminary argue that their jurisdictional challenges must succeed because Plaintiffs failed to dispute them with evidence. However, a plaintiff's duty to present evidence is triggered only when the defendant's motion is itself supported by evidence. *See Fisher v. Qantas Airways Ltd.*, 521 F. Supp. 3d 847, 856 (D. Ariz. 2021) (explaining that a plaintiff must respond with evidence only "if the defendant submits evidence contradicting an allegation in the complaint" (quoting *MMI, Inc. v. Baja, Inc.*, 743 F. Supp. 2d 1101, 1108 (D. Ariz. 2010))); *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (same). Here, neither the Archbishop nor the Seminary supported its motion with evidence. Therefore, Plaintiffs need only show that the complaint establishes a prima facie showing of personal jurisdiction.

business." *Id.* (quoting *Daimler*, 571 U.S. at 137). Only in an "exceptional case" will a corporation be "at home" elsewhere. *Daimler*, 571 U.S. at 139 n.19.

Here, Plaintiffs allege that the Archbishop is a "corporation sole," that the Seminary is a "non-profit religious organization," and that each entity has its principal place of business in California. (Doc. 44, ¶¶ 85–86.) Although not specified in the complaint, California government records show that the Seminary is in fact a corporation, and that both the Archbishop and the Seminary are incorporated in California. Entity Detail for The Roman Catholic Archbishop of Los Angeles and St. John's Seminary in California, https://businesssearch.sos.ca.gov (search entity number "C0039839" for the Archbishop and "C0183931" for the Seminary) (last visited December 9, 2021). The Court takes judicial notice of this information. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of information available on a local government website for purposes of a motion to dismiss).

Arizona is not a paradigm forum as it pertains to the Archbishop and the Seminary, and the complaint does not support finding that they are otherwise "at home" here. Consequently, they are not subject to general jurisdiction in Arizona. Plaintiffs offer no argument to the contrary.

## B.    Specific Jurisdiction

A court has specific jurisdiction when the "suit aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, n.8 (1984). The exercise of specific jurisdiction is proper only if (1) the defendant purposefully directs his activities towards the forum or purposefully avails himself of the benefits of doing business in the forum, (2) the claim arises out of or relates to the defendant's activities in the forum, and (3) the exercise of jurisdiction would be reasonable. *Morrill*, 873 F.3d at 1142 (quoting *Schwarzenegger*, 374 F.3d at 802).

### 1.    The Archbishop

The Archbishop contends that it is not subject to specific jurisdiction because it had nothing to do with the abuse of any Plaintiff. In response, Plaintiffs contend that they have

alleged a "strategic alliance" between the Archbishop and the Diocese, whereby the Archbishop "deliberately export[s]" abusive priests to Arizona to shield them from criminal responsibility in California. This, they say, is the "stuff of purposeful availment."[2] The Archbishop does not dispute that specific jurisdiction would be established if it transferred a priest to Arizona with knowledge that he was a sexual predator, and that priest then committed acts of abuse in Arizona. It contends, however, that this is not Plaintiffs' case. As explained below, the Court agrees with the Archbishop.

Under the first prong of the specific-jurisdiction test, a defendant purposefully directed his activities towards the forum if he "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that [he] knows is likely to be suffered in the forum state." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (9th Cir. 2021) (quoting *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017)). Under the second prong, the plaintiff's claim "arises out of" the defendant's forum-related activities if the activities were a "but for" cause of the plaintiff's injury. *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (quoting *Myers v. Bennett Law Offs.*, 238 F.3d 1068, 1075 (9th Cir. 2001)). A plaintiff's claim can "relate to" the defendant's forum-related activities without a causal relationship, but this standard "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co.*, 141 S. Ct. at 1026.

Here, as a preliminary matter, the Court agrees with the basic reasoning underlying Plaintiffs' argument. Assume that the Archbishop transferred a priest to Arizona, knowing that the priest had previously committed sexual abuse in California: A person who is abused by that priest in Arizona would certainly be able to establish purposeful direction

---

[2] In responding to the Archbishop's and the Seminary's arguments, Plaintiffs repeatedly use the term "purposeful availment." Purposeful availment and purposeful direction are distinct concepts. *Schwarzenegger*, 374 F.3d at 802. The availment standard applies to claims "sounding in contract" and asks whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The direction standard applies to claims "sounding in tort" and asks whether the defendant has directed his activities at the forum state, even if done from outside the state. *Id.* at 802–03 (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774–75 (1984)). The direction standard applies in this case because Plaintiffs' claims sound in tort, and because the Archbishop allegedly directed conduct towards Arizona from California.

and a nexus between the Archbishop's conduct and his claim. That is, the act of transferring a priest to Arizona is an intentional act aimed at Arizona, and the Archbishop should know that the priest is likely to commit sexual abuse in Arizona because he committed abuse in California. As for the nexus, the victim could easily argue that he would not have been abused by that particular priest but for the Archbishop transferring the priest to Arizona. This reasoning makes perfect sense.

The problem here is that there is no nexus (causal or otherwise) because Plaintiffs do not allege that the Archbishop transferred their abusers to Arizona. They allege that Father Gluch "minister[ed] in California" before he was "sent to minister" in Arizona, but they do not specify where he ministered in California or who sent him to Arizona. (Doc. 44, ¶ 89.) In other words, there is no connection between Father Gluch and the Archbishop. Similarly, although Plaintiffs allege that Father Cocio was a student at the Seminary when he abused Garcia, they do not allege that he was in Arizona at the direction of the Archbishop or anyone else. (*Id.* ¶ 114.) The fact that the Archbishop operates the Seminary does not support the inference that the Archbishop exercises control over the activities and whereabouts of the Seminary's students, and that it was doing so when Father Cocio was in Arizona.

Plaintiffs allege on information and belief that Father Knapp "ministered in California under the [Archbishop] before ministering . . . in Pirtleville, [Arizona]." (*Id.* ¶ 133.) They also allege that "Church leadership . . . purposefully sent [Father Knapp] to Pirtleville." (*Id.* ¶ 177.) While these allegations present a closer question, they still fall short. There are many scenarios in which Father Knapp could have worked under the Archbishop "before" working in Pirtleville, and most of them do not involve the Archbishop directing Father Knapp's transfer. Furthermore, although it is not wholly clear who "Church leadership" refers to, context indicates that it is the Diocese. Plaintiffs allege that Father Knapp "actively ministered in Tucson, Phoenix, Eloy, Safford, Yuma, and Nogales," and that he was a "known child molester" when he was sent to Pirtleville. (*Id.* ¶¶ 134, 177.) They also allege that the Diocese shifts its own priests from parish to parish

within Arizona after they are accused of abuse. (*Id.* ¶ 14.) All this indicates that it was the Diocese who "sent" Father Knapp to Pirtleville, assumedly after he was accused of abuse somewhere else in Arizona.

In any event, there are no allegations showing that the scenario giving rise to specific jurisdiction is more likely than any of the other scenarios. *See In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) ("Although the party asserting jurisdiction is 'required only to establish a prima facia showing of jurisdictional facts,' the standard is not toothless." (quoting *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n.2. (9th Cir. 1977))). Plaintiffs have not made a prima facie showing that their claims arise out of or relate to the Archbishop's forum-related activities. Therefore, the Archbishop is not subject to specific jurisdiction.

## 2. The Seminary

The Seminary contends that specific jurisdiction is lacking because it has no presence in Arizona and no connection to Plaintiffs or the abuse they suffered. Plaintiffs, having focused their argument on the Archbishop, do not separately respond to this distinct challenge. Regardless, the Court finds that the Seminary lacks contacts with Arizona sufficient to support the exercise of specific jurisdiction.

Plaintiffs allege that the Seminary educates seminarians who later become predatory priests. (Doc. 44, ¶¶ 11, 17–20, 37, 45, 53, 60, 132, 161.) This conduct occurs entirely in California, where the Seminary is located. It is not a contact with Arizona for purposes of the specific-jurisdiction analysis.

Plaintiffs also allege that one of the Seminary's students (Father Cocio) and three of the Seminary's graduates (Father Michael Baker, Reverend Kevin Barmasse, and Father Knapp) committed acts of abuse in Arizona. (*Id.* ¶¶ 37, 45, 53, 60, 114, 122, 132, 161.) They also allege that the Archbishop has a practice of sending the Seminary's graduates to Arizona. (*Id.* ¶¶ 13, 36, 53–56, 108, 181.) However, specific jurisdiction requires that the relationship between the defendant and the forum state "arise out of contacts that the 'defendant *himself*' creates within the forum State." *Walden*, 571 U.S. at 284 (quoting

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros*, 466 U.S. at 417. Here, there is no allegation that the Seminary was somehow involved in its student's and graduates' out-of-state, tortious conduct, or that the Seminary plays any part in the Archbishop's decisions to transfer priests. Accordingly, none of that unilateral conduct may be considered.

Plaintiffs also allege that the Seminary has a longstanding relationship with the Diocese, and that the Diocese "tr[ies] very hard to put [its] seminarians together during their formative years in seminary." (Doc. 44, ¶¶ 12, 190.) While this suggests that the Diocese expressly aims conduct at California (by placing its seminarians at the Seminary), it does not suggest that the Seminary has directed its activities towards Arizona in any meaningful way. As alleged, the Seminary's role in the relationship does not extend beyond accepting the Diocese's seminarians for training in California, where it "provides [them with] graduate level theological education." (*Id.* ¶ 28.)

The Seminary lacks relevant contacts with Arizona. Therefore, it is not subject to specific jurisdiction.

**III.   Personal Jurisdiction Under RICO**

Nationwide service of process is available in a RICO case if "the ends of justice require" it. 18 U.S.C. § 1965(b). When applicable, this provision effectively allows a federal court to exercise personal jurisdiction over a party that is not otherwise subject to the court's jurisdiction. *Butcher's Union Loc. No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538–39 (9th Cir. 1986). Nationwide services applies only if (1) "the court . . . ha[s] personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy," and (2) "the plaintiff . . . show[s] that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Id.* at 539.

Here, the Court has personal jurisdiction over the Diocese. (*See* Doc. 44, ¶ 84.) However, as Plaintiffs did not address RICO's nationwide service provision (no party did),

they have not met their burden to show that no other district court would have personal jurisdiction over all defendants. *See Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 990 (C.D. Cal. 2013) ("While it is not clear that there is [no other] district that could exercise jurisdiction over all defendants, plaintiff has the burden of showing affirmatively that this is the case."). Nationwide service is therefore unavailable.

## IV. Jurisdictional Discovery

Federal courts have broad discretion in determining whether to grant jurisdictional discovery. *Data Disc*, 557 F.2d at 1285 n.1 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)). Generally, jurisdictional discovery may be granted "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* However, a court may deny discovery "where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (alteration omitted) (quoting *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995)). A court may also deny a request for discovery when it is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto*, 539 F.3d at 1020.

Here, jurisdictional discovery is unwarranted. This is not a case where the plaintiff made an incomplete showing, and "a more satisfactory showing" could possibly be made with jurisdictional discovery. *Data Disc*, 557 F.2d at 1285 n.1. Plaintiffs have made no showing at all that the Seminary and the Archbishop could be subject to personal jurisdiction. As alleged in the complaint, the Seminary has no relevant contacts with Arizona. And although Plaintiffs allege that the Archbishop transferred predatory priests to Arizona in the past, they only speculate that their claims relate to that conduct. There is no alleged connection between Father Gluch and the Archbishop. Nor is there an alleged connection between Father Cocio and the Archbishop. While Father Knapp worked under the Archbishop, Plaintiffs allege vaguely that that occurred sometime "before" he came to Arizona. Furthermore, there is no allegation that any of these individuals were accused of

sexual abuse before they came to Arizona.

In short, Plaintiffs' request for discovery is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto*, 539 F.3d at 1020. For this reason, *Thompson v. Roman Catholic Archbishop of Washington*, 735 F. Supp. 2d 121 (D. Del. 2010), is distinguishable. There, the plaintiffs sued the Washington archbishop in Delaware district court, and the archbishop moved to dismiss for lack of personal jurisdiction. *Id.* at 124. The plaintiffs alleged that the archbishop knew that one of its priests had been caught with the plaintiffs in his bedroom, and that the same priest took the plaintiffs on trips to Delaware. *Id.* at 125–26. Because those allegations suggested that the archbishop knew or should have known that the priest was sexually abusing the plaintiffs in Delaware, the plaintiffs were given an opportunity to conduct jurisdictional discovery. *Id.* at 129. In short, the *Thompson* court allowed discovery because the plaintiffs linked the archbishop to the forum *and* to their claims. This link is missing here.

**Failure to State a Claim**

**I.    Legal Standard**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The standard is satisfied if the claim has "facial plausibility," meaning there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

A defendant may challenge the sufficiency of a complaint by filing a motion under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." A motion to dismiss under Rule 12(b)(6) may be "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (citing

*Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir. 1984)). In determining whether the plaintiff has stated a plausible claim, the court "must take all the factual allegations in the complaint as true," but it need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## II. The Diocese's Bankruptcy Discharge

### A. Background

The Diocese filed for bankruptcy in 2004, and its reorganization plan was confirmed in 2005. (Docs. 45-2, 45-3.)[3] The confirmation order contains a broad discharge provision, covering "any Claim . . . that arose from . . . any conduct of the [Diocese] prior to the Confirmation Date, or that otherwise arose before the Confirmation Date." (Doc. 45-3 at 9.) The order further provides that "all Persons" are "forever barred from pursuing [Claims] . . . related to any sexual misconduct or other acts committed by any clergy, employees, volunteers or other Persons associated with the Diocese." (*Id.* at 10.) The term "Claim," as used in the confirmation order, incorporates the bankruptcy code's definition of that term: The "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5); (Doc. 45-2 at 18, 40–41; Doc. 45-3 at 1).

### B. Discussion

The Diocese argues that Plaintiffs' claims are barred by the confirmation order because they arise from conduct that occurred 40 or more years ago. In response, Plaintiffs concede that they cannot recover for conduct that occurred prior to the confirmation date. They argue that the bankruptcy discharge does not bar this lawsuit, though, because their claims are based on conduct that occurred *after* the confirmation date.

The Court concludes that Plaintiffs' claims against the Diocese arise from pre-discharge conduct and therefore were discharged in bankruptcy. There is a simple reason for this conclusion: It is not plausible that Plaintiffs' injuries were caused by the Diocese's

---

[3] The filings in other courts are judicially noticeable and may be considered when ruling on a motion to dismiss. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

post-discharge conduct. Plaintiffs allege that their injuries include

> great pain of mind and body, shock, mental anguish, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling, lost employment and employment opportunities, wages, and other compensation to which they were entitled.

(Doc. 44, ¶¶ 196, 218, 223, 226, 230, 235, 244, 251.)

The lack of plausibility is due in large part to an obvious alternative explanation for these injuries. A federal court may properly consider alternative explanations when determining whether the plaintiff has stated a plausible claim. *Iqbal*, 556 U.S. at 681–82. In some cases, a plausible alternative explanation might be so convincing as to render the plaintiff's claim *implausible*. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). In those circumstances, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Id.* at 996–97 (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)).

This is a case in which the alternative explanation is so convincing that it renders Plaintiffs' claims implausible. Each Plaintiff alleges that he or she was sexually abused as a child. The injuries described above are consistent with harms experienced by victims of childhood sexual abuse, and it is indisputable that such harms can persist up to and throughout adulthood.[4] (*See* Doc. 44, ¶ 6; Doc. 44-1 at 3–4.) As between this obvious alternative explanation and the Diocese's post-discharge conduct, it is not plausible that the Diocese's post-discharge conduct gave rise to Plaintiffs' injuries.

The factual allegations involving Stein and Brogdon relate to their abuse and to the Diocese's response during the years that followed. (Doc. 44, ¶¶ 87–109.) These events occurred between 1967 and 1981—decades before the confirmation date. There are no

---

[4]     Indeed, Plaintiffs repeat the quoted paragraph in support of a claim titled "sexual assault/sexual abuse/molestation." (Doc. 44, ¶ 218.)

allegations that the Diocese had contact with Stein or Brogdon after the confirmation date, or that the Diocese did something after the confirmation date that even remotely pertained to Stein or Brogdon. Accordingly, to the extent these Plaintiffs are suing the Diocese for anything, it *must* be pre-discharge conduct.

But for a single allegation, Garcia would be in the same position as Stein and Brogdon. Most of the factual allegations involving Garcia pertain to his abuse and the Diocese's response, which occurred during the 1980s. (*Id.* ¶¶ 111–28.) Again, these events occurred long before the confirmation date. In addition to these allegations, Plaintiffs allege that their counsel reported Garcia's abuse to the Diocese in 2020, and that the Diocese may not have relayed that report to law enforcement. (*Id.* ¶ 129.) However, they do not allege that Garcia had a negative reaction, or any reaction, to the Diocese's alleged omission. Even in a vacuum, then, Plaintiffs have not plausibly alleged that the Diocese's post-discharge conduct injured Garcia. They certainly have not done anything to exclude the plausible alternative explanation for his injuries.

Like the other Plaintiffs, Almader and Doe provide details about their abuse, which occurred long before the confirmation date. (*Id.* ¶¶ 131–40, 160–68.) In addition, they allege that they reported their abuse to the Diocese in mid-2019. In response to Almader's report, Diocesan officials met with her to discuss her allegations. (Doc. 44-1 at 21–22.) During the meeting, they answered Almader's questions and offered to provide her with therapy. (*Id.*) The Diocese also had its investigator contact Almader as part of an internal investigation. (*Id.* at 9–19.) The emails and text messages between Almader and the investigator are friendly in tone. (*See id.*) Additionally, a Diocesan official wrote a letter to Almader, stating that her allegations could not be substantiated but that he would be "happy" to meet with her. (Doc. 44-2 at 3.) In response to learning Doe's allegations, the Diocese sent its investigator to her house, and she refused to speak with him because he was "very forceful and unempathetic." (Doc. 44, ¶¶ 171–72.)

Although Almader and Doe had direct contact with the Diocese after the confirmation date, they have not plausibly alleged claims based on that contact. Almader's

interactions with the Diocese were amicable; none of the Diocese's conduct was outwardly offensive, and there are no allegations in the complaint showing that Almader was injured by it. And while Doe alleges that the Diocese's investigator was "forceful and unempathetic" during their brief encounter, it is not plausible that that encounter could have led to "sexual dysfunction" and other injuries that are consistent with sexual abuse.

Furthermore, the plausible alternative explanation for Almader's and Doe's injuries is affirmatively supported by the complaint. Doe alleges that she "has had painful memories of the molestation come flooding back to her in recent years." (Doc. 44, ¶¶ 175–76.) She also alleges that she "has suffered and *continues to suffer* extensive injuries and hardships *as a direct result* of the predatory actions of Father Knapp" and "the coverup by Church leadership which resulted in Father Knapp, a known child molester, being purposefully sent to Pirtleville, [Arizona,] where he had unfettered access to vulnerable children." (*Id.* ¶ 177 (emphasis added).) In other words, Doe concedes that her injuries stem from her abuse.

In a letter to the Diocese, Almader stated that she currently "suffer[s] from anxiety and bouts of depression" because of her abuse. (Doc. 44-1 at 4.) She told a Diocesan official that she took medical leave to "continue working on [her] sexual abuse and recent disclosures to loved ones," and she thanked the official for "acknowledg[ing] the crime and its effects—both current and long-lasting." (*Id.* at 7.) She told another official that she is only now "able to openly admit and deal with this sad and painful experience." (*Id.* at 16.) Additionally, Almader has publicly stated that she felt "more empowered once [she] started telling what happened to [her]," and that "[t]his [lawsuit] is part of that." (Doc. 44-3 at 12.) These facts indicate that Almader's claims, like those of the other Plaintiffs, arise from pre-discharge abuse.

Plaintiffs' arguments to the contrary are not persuasive. They highlight several of their claims, stating that each claim is "premised on the Diocese's post-confirmation conduct." However, these claims merely incorporate the allegations described above, few of which pertain to post-discharge conduct, and none of which form the basis for Plaintiffs'

claims. Furthermore, the claims held out by Plaintiffs as predicated on post-discharge conduct clearly are not. For example, in support of their claim for "misrepresentation," Plaintiffs allege that Defendants have a duty to protect "young Catholic parishioners and students" from sexual abuse, and that "Defendants breached their duties [as] to Plaintiffs." (Doc. 44, ¶¶ 228–29.)

As a fallback argument, Plaintiffs argue that their injuries did not manifest until after the confirmation date, so it would be fundamentally unfair to deny them "a remedy based on a bankruptcy discharge of yet-unaccrued tort claims rooted in harms that Plaintiffs had suffered but had not yet psychologically processed." As an initial matter, this statement is notable for being an admission that Plaintiffs' claims are "rooted" in abuse. In any event, the contention is without merit. Even an unaccrued claim can be discharged in bankruptcy. *O'Loghlin v. County of Orange*, 229 F.3d 871, 874 (9th Cir. 2000) ("[A] claim arises, for purposes of discharge in bankruptcy, at the time of the events giving rise to the claim, not at the time plaintiff is first able to file suit on the claim."). Plaintiffs' abuse-related claims were discharged regardless of when their injuries first manifested.

Given the more likely explanation of childhood sexual abuse—which the complaint not only fails to exclude but in fact supports—it is not plausible that the Diocese's post-discharge conduct gave rise to Plaintiffs' injuries. Accordingly, Plaintiffs' claims arise from pre-discharge conduct and were thus discharged in bankruptcy. The Court will recommend that all claims against the Diocese be dismissed.

## III. The RICO Claim

Defendants contend that Plaintiffs have failed to state a RICO claim. A RICO claim has five elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)). The fifth element, often referred to as "RICO standing," has two components: injury and proximate causation. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118–19 (9th Cir. 2017) (quoting *Canyon County v.*

*Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008)). In this case, the Court finds that Plaintiffs have failed to plead RICO standing.

### A. Injury to a Business or Property Interest

Personal injuries, including related emotional distress, are not compensable under RICO. *Berg v. First State Ins.*, 915 F.2d 460, 464 (9th Cir. 1990). Instead, RICO provides redress only for injuries to the plaintiff's "business or property." 18 U.S.C. § 1964(c). To plead such an injury, the plaintiff must allege both "concrete financial loss" and "harm to a specific business or property interest." *Canyon County*, 519 F.3d at 975 (first quoting *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc); and then quoting *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc) (per curiam)). Whether a harm is to a "specific business or property interest [is] a categorical inquiry typically determined by reference to state law." *Diaz*, 420 F.3d at 900.

Defendants argue that Plaintiffs' claims must be dismissed because they have alleged only personal injuries. Plaintiffs dispute this characterization and argue that they have alleged two cognizable property harms: lost employment and lost choses in action. While these are indeed cognizable property harms, the Court finds that Plaintiffs have failed to allege them.

### 1. Lost Employment

*Diaz* is the leading case in this circuit concerning lost employment as a RICO injury. There, the plaintiff alleged that the police fabricated evidence against him to obtain a false conviction, and that "[he] lost employment, employment opportunities, and the wages and other compensation associated with said business, employment and opportunities, in that [he] was rendered unable to pursue gainful employment while defending himself against unjust charges and while unjustly incarcerated." *Diaz*, 420 F.3d at 898 (alterations in original). The court held that these were sufficient allegations of injury. *Id.* at 900. It explained that the right to earn wages is a property interest, and that the plaintiff had alleged injury to that interest by describing circumstances that "amount[ed] to intentional interference with contract and interference with prospective business relations, both of

- 16 -

which are established torts under California law." *Id.* at 900 & n.1. And, as the interference resulted in the plaintiff's incarceration and inability to "fulfill his employment contract or pursue valuable employment opportunities," the court found that he had alleged concrete financial loss as well. *Id.* at 900.

In reaching its conclusion, the court was careful to distinguish between "the mere loss of something of value (such as wages) [and] injury to a property interest (such as the right to earn wages)." *Id.* at 900 n.1. Financial losses alone, the court explained, do not constitute injury to business or property under RICO. *Id.* The court was also careful to explain that the plaintiff had suffered two distinct injuries—"(1) the personal injury of false imprisonment and (2) the property injury of interference with current or prospective contractual relations"—and that recovery could be had on the latter but not the former. *Id.* at 902. Finally, the court made clear that although its approach is less restrictive than others, it is wrong to suggest that "any plaintiff RICO-suave enough to allege lost employment" will have pleaded injury to a property interest. *Id.* at 901.

Here, for two reasons, Plaintiffs have not alleged injury in the form of lost employment. First, they have not alleged facts showing that Defendants interfered with their right to earn wages. To plead circumstances that "amount" to intentional inference with business relations, the plaintiff must provide at least *some* factual detail about the interference. *Id.* at 900. In *Diaz*, for example, the plaintiff alleged that the defendants made it physically impossible for him to work, as their misconduct led to his incarceration. *Id.* Here, in contrast, there are no allegations that Defendants made it impossible for Plaintiffs to work or even just made it more difficult for Plaintiffs to work. In fact, Plaintiffs do not even allege that Stein, Brogdon, Garcia, or Doe lost employment or are less employable.

While Plaintiffs acknowledge that the complaint could be deficient as to these four Plaintiffs, they maintain that Almader has adequately alleged lost employment. Almader apparently took medical leave to meet with Diocesan officials to discuss her allegations. (Doc. 44-1 at 7, 21–22.) However, while this may suggest that Almader lost wages, it does not support the inference that Defendants interfered with her right to earn wages. Almader

clearly indicated that she desired to have "[a] face-to-face meeting with the Diocese in relation" to her allegations. (*Id.* at 4.) She also indicated, while trying to schedule a date for the meeting, that she was "flexible with meeting dates and times as [she was] on medical leave intermittently to continue working on [her] sexual abuse and recent disclosures to loved ones." (*Id.* at 7.) These facts indicate that Almader made a voluntary decision to miss work; they do not plausibly suggest that the Diocese interfered with her right to work.

In their response brief, Plaintiffs emphasize their allegations that Defendants' racketeering activity injured "their business and property interests—including, but not limited to, lost employment, employment opportunities, wages, and other compensation to which they were entitled." (Doc. 44, ¶¶ 196, 214.) These allegations are insufficient to plead lost employment as a RICO injury. The *Diaz* court expressly rejected the notion that "any plaintiff RICO-suave enough to allege lost employment" will have standing. 420 F.3d at 901. It must follow that it is not enough for Plaintiffs to simply group themselves together and say the words "lost employment," which is what they have done in the cited allegations.

The second reason overlaps with the proximate-cause analysis. Plaintiffs contend that their lost employment and lost employability are not a product of their sexual abuse but rather stem from Defendants' alleged racketeering activity. This activity allegedly includes fraud and other misconduct designed to protect predatory priests and discourage victims of abuse from reporting their injuries. It is not clear from the complaint how such conduct would interfere with Plaintiffs' employment or employability. This omission is significant because, as discussed in a previous section, sexual abuse can cause harms that persist throughout adulthood, and, undoubtedly, such harms can impair a victim's ability to function in the workplace. (*See* Doc. 44, ¶ 6; Doc 44-1 at 7.) The complaint contains no facts that tend to exclude this obvious alternative explanation for any lost employment. To the contrary, the complaint indicates that Almader's lost wages were attributable to her desire to "continue working on [her] sexual abuse" and "its effects—both current and long-lasting." (Doc. 44-1 at 7.) As such, even if Plaintiffs had alleged lost employment or diminished employability, those injuries would be "derivatives of [their] emotional

distress—and [would] therefore reflect personal injuries which are not compensable under RICO." *Diaz*, 420 F.3d at 900 (quoting *Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992)).

Plaintiffs have failed to plead injury in the form of lost employment.

### 2. Lost Choses in Action

In 2019, H.B. 2466 was signed into law in Arizona. Among other things, H.B. 2466 opened a one-year "lookback window" for victims of childhood sexual abuse to sue on time-barred claims. Plaintiffs say that "they were denied the opportunity to bring a lawsuit pursuant to Arizona's 'lookback window' because of the Tucson Diocese's 2004 bankruptcy." They contend that these lost "choses in action" constitute injury under RICO. *See City of Phoenix v. Dickson*, 12 P.2d 618, 619 (Ariz. 1932) (stating that a chose in action is a cognizable property interest in Arizona), *abrogated on other grounds by Jurek v. Jurek*, 606 P.2d 812 (Ariz. 1980). The Court disagrees.

The most obvious issue with this theory is that it seeks to hold the Diocese liable for obtaining relief that it was entitled to obtain. Plaintiffs do not dispute that their abuse-related claims were validly discharged. They cannot now claim injury from the fact that the Diocese was granted that relief. If that were a cognizable injury, no discharge would truly provide a "fresh start" to the debtor, which is a core purpose of bankruptcy law. *O'Loghlin*, 229 F.3d at 875 (first citing *United States v. Sotelo*, 436 U.S. 268, 280 (1978); then citing *Kokoszka v. Belford*, 417 U.S. 642, 645–46 (1974); and then citing *Lines v. Frederick*, 400 U.S. 18, 19 (1970) (per curiam)).

Furthermore, it cannot be overlooked that Plaintiffs are asserting the very claims they say they have lost: *All* their state-law claims—including a claim for "sexual assault" against Father Knapp and Father Cocio—are brought "[p]ursuant to H.B. 2466." (Doc. 44, ¶ 4.) There is no indication in the complaint that these claims are pleaded in the alternative. On the face of it, then, Plaintiffs have not alleged lost choses in action as an injury.

Attempting to reconcile the conflict between their complaint and response brief, Plaintiffs suggested at the motion hearing that the claims asserted in the complaint are not the same claims that were discharged in bankruptcy. As the Court understands it, Plaintiffs'

argument is that H.B. 2466 "created" new claims. These new claims, Plaintiffs say, are based on the same subject matter as the discharged claims but are legally distinct from the discharged claims (and are thus actionable, irrespective of the discharge).

This argument only highlights the defects in Plaintiffs' theory. "[A] claim arises, for purposes of discharge in bankruptcy, at the time of the events giving rise to the claim, not at the time plaintiff is first able to file suit on the claim." *O'Loghlin*, 229 F.3d at 874. Even if Plaintiffs are correct that H.B. 2466 created a new right to recovery, that does not change the fact that their "claims," as defined under the bankruptcy code, arose from pre-discharge conduct and thus were discharged. Furthermore, Plaintiffs *are not* correct that H.B. 2466 created a new right to recovery. That law, in its own words, "revived" the statute of limitations for abuse-related claims. H.B. 2466, 54th Leg., 1st Reg. Sess. (Ariz. 2019). The concept of "revival" involves the restoration of something which already exists but has expired in some way. *See Revival*, Black's Law Dictionary (11th ed. 2019). Contrary to Plaintiffs' argument, H.B. 2466 did not create new claims; it simply restored the statute of limitations for already existing ones. That, of course, has no effect on a federal bankruptcy discharge. *See Nat'l Collection Agency, Inc. v. Trahan*, 624 F.2d 906, 907 (9th Cir. 1980) (explaining that "[a] state law that is contrary to federal bankruptcy law must yield").

Plaintiffs have failed to plead injury in the form of lost choses in action.

## B. Proximate Causation

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (alteration in original) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 271, 274 (1992)). The "general tendency" is to not go "beyond the first step" in the chain of causation. *Id.* at 10 (quoting *Holmes*, 503 U.S. at 271–72). There are situations, however, where a direct relationship exists beyond the first step. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1257 (9th Cir. 2019);

*City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1036 (9th Cir. 2021) (en banc).

Here, even if Plaintiffs had alleged an interference with their employment—and, again, they have not—they could not plausibly allege that it was directly related to Defendants' wire fraud, mail fraud, or obstruction of justice. Doe, for instance, alleges that her "extensive injuries and hardships [are] a direct result of the predatory actions of Father Knapp." (Doc. 44, ¶ 177.) And all Plaintiffs group their generalized allegations of lost employment with injuries that are consistent with sexual abuse, including "emotional distress," "sexual dysfunction," and "past and future medical expenses for psychological treatment, therapy, and counseling." (*Id.* ¶ 196.) Indeed, Plaintiffs acknowledge in their response brief that their "injuries were directly and proximately caused by clergy who were under the control of the Arch[bishop], then the Diocese of Tucson."

The best example of proximate causation that Plaintiffs could identify is Almader's lost wages. They allege that the Diocese committed obstruction of justice by lying to Almader that the police declined to investigate her allegations. (*Id.* ¶¶ 144, 156.) They say that this racketeering activity directly caused Almader to assist in the Diocese's investigation and thus miss work.

As an initial matter, this is not indictable obstruction of justice. *See* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" as including "any act which is indictable under" an enumerated list of statutes). Plaintiffs are correct that a legal proceeding need not be ongoing for 18 U.S.C. § 1512 to apply, but the circumstances they describe nevertheless do not fit the statute. The closest applicable provision is § 1512(b)(3), which prohibits the use of "misleading conduct . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense . . . ." Conceivably, the Diocese would lie about reporting Almader's allegations of abuse so that she would not report them herself, but there are no facts suggesting that her allegations amount to a federal crime. Another provision, § 1512(b)(1), prohibits the use of "misleading conduct . . . with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding." There

certainly are no facts indicating that the Diocese's lie was intended to prevent Almader from testifying in a civil or criminal case once one had been commenced.

As for proximate cause, there appears to be a temporal problem with Plaintiffs' argument: Almader met with the Diocese's investigator in July 2019, and the Diocese's alleged falsehood was made in August 2019. (Doc. 44-1 at 10–11, 19; Doc. 44-2 at 3.) The Diocese suggested that Almader might already be aware that the police declined to investigate, but there are no facts indicating who relayed that information or when it was relayed. (Doc. 44-2 at 3.) In any event, Almader told the Diocese in June 2019 that she wanted "[a] full investigation of [her] allegation by the diocese." (Doc. 44-1 at 4.) This suggests that Almader's participation in the investigation was not a product of criminal obstruction, but of her own voluntary decision—made before the Diocese lied to her—to "voic[e] the truth" about what happened to her. (*Id.*)

Almader met with Diocesan officials after the investigation was complete and she had been notified about the police's failure to investigate. (*Id.* at 21–22.) Assuming Plaintiffs meant that Almader's lost wages stem from attending this meeting and not from assisting in the investigation, proximate cause would still be missing. As an initial matter, out of everything said in the Diocese's letter to Almader, it is not plausible that it was the alleged falsehood that directly caused Almader to miss work. More likely, it was the Diocese's statement that it would be "happy" to meet with her. (Doc. 44-2 at 3.) Furthermore, Almader made clear in her June 2019 letter that she wanted "[a] face-to-face meeting with the Diocese in relation to" her allegations. (Doc. 44-1 at 4.) As Almader decided that she wanted to meet with the Diocese before any falsehood was made, it is not plausible that the falsehood was the cause of her lost wages.

Plaintiffs concede that, as compared to Almader's lost wages, "some of the other[ examples of proximate cause] are a bit attenuated," so the analysis need not go much further. As a final matter, in their response brief, Plaintiffs highlight the following allegation: "[Defendants' RICO] violations have proximately caused injury to [Plaintiffs'] business and property interests—including, but not limited to, lost employment,

employment opportunities, wages, and other compensation to which they were entitled." (Doc. 44, ¶ 214.) This is merely "a legal conclusion about proximate cause." *Hemi Grp.*, 559 U.S. at 13–14 (alleging that the defendant's predicate acts "directly caused" the plaintiff's harm "is a legal conclusion about proximate cause"). It is well-established that a court need not credit legal conclusions when ruling on a motion to dismiss. *Iqbal*, 556 U.S. at 678–79.

Plaintiffs also fail to allege that Defendants' predicate acts of mail fraud, wire fraud, and obstruction of justice "led directly" to their lost choses in action. They expressly tie this alleged injury to the Diocese's bankruptcy. According to Plaintiffs, they "were unquestionably deprived of a property interest as recently as December 31, 202[0,] . . . when they were denied the opportunity to bring a lawsuit pursuant to Arizona's 'lookback window' because of the Tucson Diocese's 2004 bankruptcy." However, bankruptcy is not racketeering activity under 18 U.S.C. § 1961(1). So, while there is a direct connection between the Diocese's conduct and Plaintiffs' alleged injury, it is not one that can support a RICO claim. Plaintiffs' characterization of the bankruptcy as part of some larger "scheme" does not alter this conclusion. (Doc. 44, ¶ 191.) This is particularly true given their concession that the bankruptcy is legally valid.

## IV. Leave to Amend

"It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam)). "Amendment is futile if the claim sought to be added is not viable on the merits." *Hooper v. Shinn*, 985 F.3d 594, 622 (9th Cir. 2021). "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)).

Amendment here would be futile. The Court lacks personal jurisdiction over the

Archbishop and the Seminary. *See Vantage Mobility Int'l LLC v. Kersey Mobility LLC*, No. CV-19-04684-PHX, 2021 WL 1610229, at \*9 (D. Ariz. Apr. 26, 2021) (holding that amendment would be futile because personal jurisdiction was lacking). Plaintiffs have not specified what facts they could add to remedy this defect, and it is apparent that their request for jurisdictional discovery is based on speculation that the Archbishop and the Seminary were involved in their abuse. As to the Diocese, Plaintiffs' claims were discharged in bankruptcy. Notably, although the complaint was drafted with the aim of avoiding the bankruptcy discharge, Plaintiffs still failed to plausibly allege claims based on actionable, post-discharge conduct. (*See* Doc. 44, ¶¶ 184–85.)

It is also relevant that Plaintiffs have amended twice already. These amendments reflect Plaintiffs' efforts to shore up the factual bases for their claims and remedy defects identified by the Diocese in its prior motions to dismiss. For instance, the second amended complaint includes, for the first time, an allegation that Defendants' racketeering activity injured Plaintiffs in their "business and property." It also includes new allegations concerning victim tampering by a Diocesan official. Despite these efforts, however, Plaintiffs fall far short of alleging a RICO claim. These circumstances support the conclusion that a third amendment would be futile.

### Supplemental Jurisdiction

The district court may decline supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Here, the Court will recommend that the district court decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims. *See Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) (affirming the dismissal of state-law claims under § 1367(c)(3) following the grant of a Rule 12(b)(6) motion); *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478 (9th Cir. 1998) (stating that no explanation is required to decline jurisdiction under § 1367(c)(3)).

### Conclusion

The Court finds that the Archbishop and the Seminary must be dismissed for lack of personal jurisdiction; that the Diocese must be dismissed because Plaintiffs' claims

against it were discharged in bankruptcy; that Plaintiffs fail to state a RICO claim, and that amendment of that claim would be futile; and that supplemental jurisdiction over Plaintiffs' state-law claims should be declined.[5] Therefore,

**IT IS RECOMMENDED** that the motions to dismiss (Docs. 45, 46, 47) be **granted in part** as set forth above, and that the second amended complaint be dismissed without leave to amend.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties shall have fourteen days from the date of service of this recommendation to file specific written objections with the district court. The parties shall have fourteen days to file responses to any objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). No replies may be filed absent prior authorization by the district court. Failure to file timely objections may result in the acceptance of this recommendation by the district court without de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 9th day of December, 2021.

Honorable Maria S. Aguilera
United States Magistrate Judge

---

[5] In light of these findings, the Court finds it unnecessary to address Defendants' remaining arguments.